1 | JUDITH BROWN CHOMSKY
LAW OFFICES OF JUDITH BROWN CHOMSKY
2 | Post Office Box 29726
Elkins Park, PA 19027
3 | Telephone: (215) 782-8367
Facsimile: (215) 782-8368
4 | (Counsel of Record)

5 | RICHARD HERZ, ESQ.
MARCO SIMONS, ESQ. [S.B. #237314]
6 | EARTHRIGHTS INTERNATIONAL
1612 K Street N.W., Suite 401
7 | Washington, DC 20006
Telephone: (202) 466-5188
8 | Facsimile: (202) 466-5189

9 | [Counsel For Plaintiffs Continued On Next Page]

**RECEIVED**

JUL 19 2007,

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

07- 3406 (JAG)

10 | **UNITED STATES DISTRICT COURT**

11 | **DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOHN DOE 1, individually and as representative of his deceased father JOHN DOE 2; | Case No: |
| JANE DOE 1, individually and as representative of her deceased mother JANE DOE 2; | **CLASS ACTION COMPLAINT FOR DAMAGES** |
| JOHN DOE 3, individually and as representative of his deceased brother JOHN DOE 4; | |
| JANE DOE 3, individually and as representative of her deceased husband JOHN DOE 5; | 1. EXTRAJUDICIAL KILLING |
| MINOR DOES 1–4, by and through their guardian JOHN DOE 6, individually and as representative of their deceased mother JANE DOE 4; | 2. CRIMES AGAINST HUMANITY |
| | 3. TORTURE |
| | 4. WAR CRIMES |
| | 5. TERRORISM |
| | 6. MATERIAL SUPPORT TO TERRORIST ORGANIZATIONS |
| JOHN DOE 7, individually and as representative of his deceased son JOHN DOE 8, | 7. CRUEL, INHUMAN, OR DEGRADING TREATMENT |
| Plaintiffs, | 8. VIOLATION OF THE RIGHTS TO LIFE, LIBERTY AND SECURITY OF PERSON AND PEACEFUL ASSEMBLY AND ASSOCIATION |
| v. | 9. CONSISTENT PATTERN OF GROSS VIOLATIONS OF HUMAN RIGHTS |
| CHIQUITA BRANDS INTERNATIONAL, INC., a New Jersey corporation; | 10. WRONGFUL DEATH |
| MOE CORPORATIONS 1–10; | 11. ASSAULT AND BATTERY |
| MOES 11-25, | 12. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS |
| Defendants. | 13. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS |
| | 14. NEGLIGENCE/NEGLIGENT HIRING/ NEGLIGENCE PER SE |
| | 15. LOSS OF CONSORTIUM |
| | **DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

1  Counsel for Plaintiffs
(continued from first page)

2

3  PAUL HOFFMAN                          ARTURO CARRILLO
   SCHONBRUN, DESIMONE, SEPLOW,          COLOMBIAN INSTITUTE OF
   HARRIS & HOFFMAN LLP                  INTERNATIONAL LAW
4  723 Ocean Front Walk                  5425 Connecticut Ave NW #219
   Venice, California 90210              Washington, DC 20015
5  Telephone: (310) 396-0731             Telephone: (202) 365-7260
   Facsimile: (310) 399-7040

6

7  On information and belief, Plaintiffs, by their attorneys, allege as follows:

8                                  **ADDRESSES**

9      1.      Pursuant to Local Civil Rule 10.1(a), all Plaintiffs can be contacted through their counsel,

10  EarthRights International, 1612 K Street NW #401, Washington, DC 20006.  The street and postal

11  addresses of the individual Plaintiffs cannot be made public due to the substantial risk of violent

12  reprisals against them.  The street and postal address of Defendant Chiquita Brands International, Inc.

13  (CBI), is 250 East Fifth Street, Cincinatti, Ohio 45202; their local office in New Jersey is 20 Berry Place,

14  Glen Rock, New Jersey 07452.  The street and postal addresses of Defendants Moe Corporations 1–10

15  and Moes 11–25 are presently unknown to Plaintiffs.

16                                 **INTRODUCTION**

17     2.      This case arises as a result of the actions of Defendant Chiquita Brands International, Inc.,

18  and its subsidiaries and affiliates (collectively, "Chiquita"), in funding, arming, and otherwise supporting

19  terrorist organizations in Colombia, in order to maintain its profitable control of Colombia's banana-

20  growing regions.  Plaintiffs are family members of trade unionists, banana workers, political organizers,

21  social activists, and others targeted and killed by terrorists, notably the paramilitary organization United

22  Self-Defense Committees of Colombia (*Autodefensorias Unidas de Colombia*, or AUC), during the

23  1990s through 2004.  In order to operate its banana production in an environment free of labor

24  opposition and social disturbances, Chiquita funded, armed, and otherwise supported the AUC and other

25  terrorist groups during this period.  The deaths of Plaintiffs' relatives were a direct, foreseeable, and

26  intended result of Chiquita's illegal and tortious actions.  Chiquita's actions violated not only Colombian

27  law and U.S. law, but also international law prohibiting crimes against humanity, extrajudicial killing,

28

CLASS ACTION COMPLAINT
                                        2

1   torture, war crimes, and other abuses.

2                                    **JURISDICTION**

3       3.      The Court has jurisdiction over this case under 28 U.S.C. §1331 (federal question

4   jurisdiction); 28 U.S.C. §1350 (Alien Tort Claims Act); 18 U.S.C. § 1964(c) (Racketeer Influenced and

5   Corrupt Organizations Act); and 28 U.S.C. §1332 (diversity jurisdiction).  Plaintiffs and Defendants are

6   citizens of different states and the damages sought by this Complaint exceed the jurisdictional minimum

7   for this Court.

8       4.      In addition, Plaintiffs invoke the supplemental jurisdiction of this Court with respect to

9   claims based upon laws of the State of New Jersey or any other applicable jurisdiction pursuant to 28

10  U.S.C. § 1367.

11                                     **PARTIES**

12      5.      The term "Plaintiffs" herein includes the named plaintiffs and the decedent on behalf of

13  whom they bring this action.

14      6.      Plaintiff John Doe 1 is a resident and citizen of Colombia.  He brings this action

15  individually and as representative of his deceased father, John Doe 2.

16      7.      Plaintiff Jane Doe 1 is a resident and citizen of Colombia.  She brings this action

17  individually and as representative of her deceased mother, Jane Doe 2.

18      8.      Plaintiff John Doe 3 is a resident and citizen of Colombia.  He brings this action

19  individually and as representative of his deceased brother, John Doe 4.

20      9.      Plaintiff Jane Doe 3 is a resident and citizen of Colombia.  She brings this action

21  individually and as representative of her deceased husband, John Doe 5.

22      10.     Minor Does 1–4 are residents and citizens of Colombia.  They are all minor children, who

23  prosecute this action by and through their guardian John Doe 6.  They bring this action individually and

24  as representatives of their deceased mother, Jane Doe 4.

25      11.     Plaintiff John Doe 7 is a resident and citizen of Colombia.  He bring this action

26  individually and as representative of his deceased son, John Doe 8.

27      12.     Defendant Chiquita Brands International, Inc., is a United States-based corporation

28  organized under the laws of the State of New Jersey.  Its corporate headquarters are located in

CLASS ACTION COMPLAINT

1    Cincinnati, Ohio. CBI is a leading international producer, distributor, and marketer of bananas and other
2    produce; it is one of the largest banana producers in the world and a major supplier of bananas in Europe
3    and North America. The company was founded in 1899 as the United Fruit Company, became the
4    United Brands Company in 1970, and changed its name to Chiquita Brands International in 1990.

5        13.    On information and belief, at all times relevant herein, CBI wholly owned, dominated and
6    controlled C.I. Bananos de Exportación, S.A. ("Banadex"), headquartered in Medellín, Colombia.
7    Banadex produced bananas in the Urabá and Santa Marta regions of Colombia and, by 2003, was
8    Chiquita's most profitable banana-producing operation. At all times material herein, Banadex was an
9    agent, alter ego, co-conspirator, and joint tortfeasor with CBI, with whom it cooperated in a joint
10   criminal enterprise.

11       14.    Plaintiffs are ignorant of the true names and capacities of the Defendants who are sued
12   herein as Moe Corporations 1–5 and Moes 6–25, and Plaintiffs sue these Defendants by such fictitious
13   names and capacities. Plaintiffs will amend this Complaint to allege the Moes' true names and
14   capacities when ascertained. Plaintiffs are informed and believe, and on that basis allege, that each
15   fictitiously named Defendant is responsible in some manner for the occurrences herein alleged and that
16   the injuries to Plaintiffs herein alleged were proximately caused by the conduct of such Defendants, in
17   that each caused, conspired to cause, worked in concert to cause, participated in a joint criminal
18   enterprise that caused, or aided and abetted the injuries complained of, and/or was the principal,
19   employer, or other legally responsible person for the persons who caused, conspired to cause, worked in
20   concert to cause, participated in a joint criminal enterprise that caused, and/or aided and abetted such
21   injuries. Whenever and wherever reference is made in this Complaint to any conduct committed by CBI,
22   and/or Banadex, such allegations and references shall also be deemed to mean the conduct of CBI and
23   Banadex, acting individually, jointly and severally, through personnel working in the United States and
24   Colombia for the benefit of CBI and Banadex.

25       15.    At all times herein material, with respect to the events at issue, CBI, Banadex, Moe
26   Corporations 1–5 and Moes 6–25 conspired with each other, and/or participated in a joint criminal
27   enterprise with each other, and/or acted in concert, and/or aided or abetted each others' actions, and/or
28   were in an agency or alter ego or joint venture relationship, and were acting within the course and scope

CLASS ACTION COMPLAINT

of such conspiracy, joint criminal enterprise, concerted activity, aiding and abetting, and/or agency or alter ego or joint venture relationship. As described herein, "agency" includes agency by ratification. Whenever reference is made in this Complaint to any conduct by a defendant, such allegations and references shall be construed to mean the conduct of each of the defendants, acting individually, jointly, and severally.

16.     At all times herein material, with respect to the events at issue, Chiquita conspired with, worked in concert with, participated in a joint criminal enterprise with, acted as the principal of, employed, and/or aided and abetted the violent terrorist organizations responsible for Plaintiffs' injuries, including but not limited to the AUC, and the terrorist organizations were acting within the course and scope of such agency, employment, and/or concerted activity.  The wrongful conduct alleged herein was perpetrated by Chiquita management and personnel both in Colombia and the United States.

17.     Plaintiffs are informed and believe and based upon such information and belief allege that CBI management and other personnel in the United States and in Colombia were informed of the ongoing events complained of herein and personally participated in the decision making, planning, preparation, ratification, and/or execution of the acts complained of.

## STATEMENT OF FACTS

### The Colombian Conflict and Paramilitary Terrorist Organizations

18.     In the early 1980s, Colombia saw a vast expansion in trade in illegal drugs, particularly cocaine.  An emerging class of drug barons began to create private armies to combat left-wing guerrilla forces, including the Revolutionary Armed Forces of Colombia (*Fuerzas Armadas Revolucionarios de Colombia*, or FARC) and the National Liberation Army (*Ejercito Nacional de Liberacion*, or ELN), who were engaged in terrorist activities such as extortion, kidnappings, and assassinations.  These paramilitaries acted autonomously and were dispersed, and their influence was reduced to the local scale.

19.     In 1981, the Medellín cartel created a death squad, *Muerte a Secuestradores* ("Death to Kidnappers"), that targeted guerillas for elimination and adopted brutal, terrorist tactics.  As the 1980s progressed, paramilitaries maintained links with drug barons, large landowners, industrialists, and bankers who funded them, although in some cases they achieved some autonomy in their violent activities.

CLASS ACTION COMPLAINT

20.     By the mid 1990s, paramilitary groups had achieved a substantial degree of independence due to their increased participation in, and benefit from, drug trafficking. The largest and most well-organized paramilitary group in Colombia was the Rural Self-Defense Group of Córdoba and Urabá (*Autodefensas Campesinas de Córdoba and Urabá*, or ACCU). The organization featured a central command that coordinated the activities of local fronts. Both mobile and stationary units existed, and fighters received a base salary plus food, a uniform, weapons, and munitions. The commander-in-chief of the ACCU was Carlos Castaño, a long-time paramilitary fighter with family ties to the drug trade. In 1994, Castaño and the ACCU sponsored a summit of the Self-Defense Groups of Colombia, bringing together regional paramilitaries from across the country. This summit led to the formation of the AUC, a national federation uniting Colombia's regional paramilitaries under Castaño's leadership. At all times relevant to this Complaint, Castaño remained the leader of the AUC.

21.     The AUC grew rapidly in size during the late 1990s and into the twenty-first century. In 1997, it comprised roughly 4,000 combatants. By 2001, Castaño claimed to have 11,000 members, though government estimates put the number somewhere between 8,000 and 9,000. By 2002, AUC forces were present in nearly the whole of Colombia. AUC leaders have claimed that the organization comprised as many as 17,000 armed fighters and 10,000 associates at its peak before a demobilization process that began in 2004.

22.     The efforts of the AUC were directed toward elimination of anyone considered close to the guerrillas or who opposed or complicated the paramilitaries' control of territory or population in the area in which they exerted their power. The AUC's primary method was terrorism against individuals or communities. To this end, the AUC, like the ACCU before it, routinely engaged in death threats, extrajudicial killings, massacres, torture, rape, kidnapping, forced disappearances, and looting. While the AUC periodically engaged in direct combat with armed guerrilla forces, the vast majority of its victims were civilians targeted by a policy of political and social cleansing, typically rural workers, trade unionists, community activists, human rights defenders, leftist politicians, judicial investigators, indigenous persons, and anyone considered socially undesirable (including suspected petty criminals). Inhabitants of small towns in contested rural areas were particularly vulnerable. AUC violence has often caused entire communities to disperse, either due to threats of an impending massacre or in the wake of

CLASS ACTION COMPLAINT

such massacres and the looting and destruction that commonly accompanied them.

23.     The abuses of the AUC and its constituent groups, including the ACCU, covered a large area, affected a large population, and were carried out systematically. The ACCU operated throughout the banana-growing region of Uraba, as well as in other parts of Colombia, and on many occasions from at least 1994 through 2004 carried out multiple executions or massacres; the ACCU and other AUC groups were responsible for at least 150 massacres by 1997. From its founding, its activities and abuses have been carried out under the direction of a central command.

24.     The AUC and its constituent groups, including the ACCU, have, at least since 1994, been participating in an internal armed conflict in Colombia, at times engaging in direct conflict with guerrilla armies. The AUC itself has accepted that it is subject to the laws of war, with the limited exception that it believes it has the privilege to execute guerrillas *hors de combat*, and has accepted training in the laws of war from the International Committee of the Red Cross.

25.     Longstanding and pervasive ties exist between the AUC and official Colombian security forces, which include the Colombian Armed Forces and the Colombian National Police. Collusion with government forces has been a feature of Colombian paramilitaries since their inception. In the 1980s, paramilitaries were partially organized and armed by the Colombian military and participated in campaigns of the official armed forces against guerilla insurgents. Paramilitary forces included active-duty and retired army and police personnel among their members. Although a 1989 government decree established criminal penalties for providing assistance to paramilitaries, the continued existence of military/paramilitary ties has been documented by Colombian non-governmental organizations, international human rights groups, the U.S. State Department, the Office of the U.N. High Commissioner for Human Rights, and the Colombian Attorney General's office. Cooperation with paramilitaries has been demonstrated in half of Colombia's eighteen brigade-level Army units, spread across all of the Army's regional divisions. Such cooperation is so pervasive that the paramilitaries are referred to by many in Colombia as the "Sixth Division," in addition to the five official divisions of the Colombian Army.

26.     Government security forces have habitually tolerated the presence of paramilitaries, willfully failed to prevent or interrupt their crimes, actively conspired with them, and coordinated

CLASS ACTION COMPLAINT

activities with them. Documented examples include:

- Allowing paramilitaries to establish permanent bases and checkpoints without interference;
- Failing to carry out arrest warrants for paramilitary leaders, who move about the country freely;
- Withdrawing security forces from villages deemed sympathetic to guerrillas, leaving them vulnerable to attack by paramilitaries;
- Failing to intervene to stop ongoing massacres occurring over a period of days;
- Sharing intelligence, including the names of suspect guerilla collaborators;
- Sharing vehicles, including army trucks used to transport paramilitary fighters;
- Supplying weapons and munitions;
- Allowing passage through roadblocks;
- Providing support with helicopters and medical aid;
- Communicating via radio, cellular telephones, and beepers;
- Sharing members, including active-duty soldiers serving in paramilitary units and paramilitary commanders lodging on military bases; and
- Planning and carrying out joint operations.

27.    In a recurring pattern, paramilitaries have taken over villages and assaulted inhabitants while nearby security forces have either not intervened or have intervened to facilitate the violence. In October 1997, for example, members of the Army's Fourth Brigade reportedly established a perimeter around the village of El Aro, in Antioquia. While the Army prevented entry and escape, members of the AUC entered the village and over a period of five days executed at least eleven people, burned most of the houses, looted stores, and destroyed the pipes that fed the homes potable water. Upon leaving the village, the paramilitaries forcibly disappeared over thirty more people and compelled most of the residents to flee. In January 2001, more than one hundred AUC fighters took over the village of Chengue, in Sucre. The AUC executed twenty-five people before setting fire to the village and forcibly disappearing ten additional villagers. Troops from the First Marine Infantry Unit positioned outside the village allegedly prevented humanitarian organizations from entering the area to aid survivors. Myriad

CLASS ACTION COMPLAINT

8

1  similar incidents have been reported.

2      28.    The violent and terroristic activities of the AUC and its constituent groups, including the

3  ACCU, have at all times been well-known throughout Colombia and the world.

4                    **Chiquita's Support of the AUC and Other Terrorists**

5      29.    Chiquita, as the successor to the United Fruit Company and the United Brands Company,

6  has been involved in the production and exportation of produce from Central and South American

7  nations, including Colombia, for over a century.  At all relevant times, Chiquita has produced bananas in

8  the Urabá and Santa Marta regions of Colombia.

9      30.    On information and belief, from the early 1990s until at least 1997, Chiquita provided

10  material support, including money, to terrorist organizations such as the ACCU and other predecessors

11  of the AUC.

12      31.    On information and belief, in the years prior to Chiquita's provision of support to the

13  paramilitaries, these armed groups did not control the territory of the banana-producing regions of

14  Colombia.  The collaboration with Chiquita allowed the paramilitaries to consolidate as the decisive

15  actor in the political, military, and social terrain of the banana region.  In exchange for its financial

16  support to the AUC, Chiquita was able to operate in an environment in which labor and community

17  opposition was suppressed.

18                              *Payments to the AUC*

19      32.    From 1997 until at least February 2004, Chiquita provided material support to the AUC

20  in Urabá and Santa Marta.  By 1997, the AUC effectively controlled large swathes of territory, as well as

21  exerting influence in institutions such as labor organizations and local governments, in these regions.

22  On information and belief, the stability and social control provided by the AUC was to Chiquita's

23  benefit, in allowing exportation of bananas without interruption due to conflict.  The influence of the

24  AUC in the leadership of the banana workers' trade unions was also to Chiquita's benefit, as it reduced

25  labor strife.  The AUC also provided protection services to banana plantations, dealing out reprisals

26  against real or suspected thieves, as well as against social undesirables, suspected guerrilla sympathizers

27  or supporters, and anyone who was suspected of opposing the AUC's activities and social program.

28      33.    Chiquita paid the AUC, directly or indirectly, nearly every month during the period

CLASS ACTION COMPLAINT

1997–2004, making over one hundred payments to the AUC totaling over $1.7 million.  Chiquita's

payments to the AUC were reviewed and approved by senior executives of the corporation, including

high-ranking officers, directors, and employees.  Chiquita's senior executives knew that the corporation

was paying the AUC and that the AUC was a violent, paramilitary organization led by Carlos Castaño.

Payments made to the AUC or to front organizations were recorded in Chiquita's corporate books and

records as "security payments" or payments for "security" or "security services."  Other payments, made

to Banadex executives with the intent that they would be withdrawn as cash and handed directly to the

AUC, were recorded as income contributions.

      34.    At all relevant times, Chiquita knew that the AUC was a violent, terrorist paramilitary

organization.  On September 10, 2001, the United States government designated the AUC as a Foreign

Terrorist Organization ("FTO"), and that designation was well-publicized in the American public media,

including in the Cincinnati Post on October 6, 2001, and in the Cincinnati Enquirer on October 17, 2001,

as well as in the Colombian media.

      35.    In 2003, Chiquita consulted with attorneys from the District of Columbia office of a

national law firm ("outside counsel") about Chiquita's ongoing payments to the AUC.  Outside counsel

advised Chiquita that the payments were illegal under United States law and that Chiquita should

immediately stop paying the AUC directly or indirectly. Among other things, outside counsel advised

Chiquita:

- "Must stop payments."
- "Bottom Line: CANNOT MAKE THE PAYMENT"
- "General Rule: Cannot do indirectly what you cannot do directly"
- "Concluded with: CANNOT MAKE THE PAYMENT"
- "You voluntarily put yourself in this position. Duress defense can wear out through repetition. Buz [business] decision to stay in harm's way. Chiquita should leave Colombia."
- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
- "[T]he company should not make the payment."

36.    Although CBI's Board of Directors agreed to disclose its payments to the AUC to the U.S. Department of Justice on or about April 3, 2003, on April 8, 2003, CBI instructed Banadex to continue making the payments to the AUC.  On April 24, 2003, CBI met with Justice Department officials, who told CBI the payments were illegal.  Nonetheless, Chiquita continued to make the payments until at least February 2004.

37.    On March 19, 2007, Chiquita pled guilty in U.S. District Court for the District of Colombia to one count of engaging in transactions with a specially designated global terrorist. The company's sentence will include a $25 million criminal fine, the requirement to implement and maintain an effective compliance and ethics program, and five years' probation.

*Other Support of the AUC*

38.    In 2001, Chiquita facilitated the clandestine and illegal transfer of arms and ammunition from Nicaragua to the AUC.

39.    The Nicaraguan National Police provided 3,000 AK-47 assault rifles and 2.5 million rounds of ammunition to a private Guatemalan arms dealership, Grupo de Representaciones Internationales S.A. ("GIR S.A."), in exchange for weapons more suited to police work.  GIR S.A., in turn, arranged to sell the AK-47s and ammunition for $575,000 to Shimon Yelinek, an arms merchant based in Panama.  In November 2001, Yelinek loaded the arms onto a Panamanian-registered ship with Panama as its declared destination, but the ship instead went to Turbo, Colombia.

40.    Chiquita, through Banadex, operates a private port facility at the Colombian municipality of Turbo, used for the transport of bananas and other cargo.  The arms ship docked at the Chiquita port, and Banadex employees unloaded the 3,000 assault rifles and 2.5 millions rounds of ammunition.  These arms and ammunition were then transferred to the AUC.

41.    On information and belief, Chiquita facilitated at least four other arms shipments to the AUC.  In an interview with the Colombian newspaper *El Tiempo*, AUC leader Carlos Castaño subsequently boasted, "This is the greatest achievement by the AUC so far. Through Central America, five shipments, 13 thousand rifles."

42.    On information and belief, Chiquita was aware of the use of its facilities for the illegal transshipment of arms to the AUC, and intended to provide such support and assistance to the AUC.

CLASS ACTION COMPLAINT

11

43.     On information and belief, Chiquita also assisted the AUC by allowing the use of its private port facilities not only for the illegal importation of arms, but also for the illegal exportation of large amounts of illegal drugs, especially cocaine. The drug trade was a major source of income for the AUC. Chiquita could have prevented this drug trade and assistance to the AUC, but knowingly allowed use of its port and banana transportation boats for this purpose.

**Plaintiffs' Injuries**

*John Doe 1/John Doe 2*

44.     John Doe 1's father, John Doe 2, was a banana worker in Uraba and active in labor organizing. In 2001, this area was effectively controlled by the AUC.

45.     In 2001, John Doe 2 was traveling by bus from his home to the banana farm. The bus was stopped by AUC paramilitaries. The paramilitaries removed John Doe 2 from the bus and executed him.

46.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 2 through its support of the AUC in Uraba. On information and belief, Chiquita benefited from the death of John Doe 2 by removing a labor activist who threatened the stability of Chiquita's operations.

*Jane Doe 1/Jane Doe 2*

47.     Jane Doe 1's mother, Jane Doe 2, lived in a town in Uraba with her family. She was involved in civic and social activities of which the AUC did not approve, including advocating for marginalized groups.

48.     In 1998, Jane Doe 2 told Jane Doe 1 that she was afraid she would be killed for her activities. Approximately one week later, AUC paramilitaries arrived at Jane Doe 2's house. In the presence of her family, the paramilitaries removed Jane Doe 2 from her house, and then executed her. Subsequently, the family of Jane Doe 2, including Jane Doe 1, fled their community in fear.

49.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 2 through its support of the AUC in Uraba. On information and belief, Chiquita benefited from the death of Jane Doe 2 by removing a social activist who threatened the stability of Chiquita's operations and the generally established social order.

CLASS ACTION COMPLAINT

*John Doe 3/John Doe 4*

50.     John Doe 3's brother, John Doe 4, was a banana worker at a plantation in Uraba, and a leader of a labor union committee.

51.     In 1998, John Doe 4 was involved in a protest against low wages. John Doe 3 and John Doe 4 were eating lunch at their banana plantation when AUC paramilitaries approached John Doe 4, identified him by name, and executed him.

52.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 4 through its support of the AUC in Uraba.  On information and belief, Chiquita benefited from the death of John Doe 4 by removing a labor activist who threatened the stability of Chiquita's operations.

*Jane Doe 3/John Doe 5*

53.     Jane Doe 3's husband, John Doe 5, was a banana worker in Uraba.

54.     In 1997, John Doe 5 became a target of AUC paramilitaries because they accused him of paying ransom to the FARC for his kidnapped brother.  The AUC took John Doe 5 from his banana farm and executed him.  AUC paramilitaries subsequently told John Doe 5's family that they had killed him.

55.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 5 through its support of the AUC in Uraba.  On information and belief, Chiquita benefited from the death of John Doe 5 by strengthening the AUC itself, in sending a message that payment of revenue to AUC opponents such as the FARC would be dealt with harshly.

*Minor Does 1–4/John Doe 6/Jane Doe 4*

56.     The mother of Minor Does 1–4, Jane Doe 4, was involved in civic and social activist, engaging in activities of which the AUC did not approve, in a town in Uraba, where she lived with her family.

57.     In 2004, AUC paramilitaries came to Jane Doe 4's house and executed her in the presence of her family.  Subsequently, the family of Jane Doe 4, including Minor Does 1–4, fled their community in fear.

58.     On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of Jane Doe 4 through its support of the AUC in Uraba.  On information and belief,

CLASS ACTION COMPLAINT

13

Chiquita benefited from the death of Jane Doe 4 by removing a social activist who threatened the stability of Chiquita's operations and the generally established social order.

*John Doe 7/John Doe 8*

59.    John Doe 7's son, John Doe 8, was a banana worker at a plantation in Uraba.

60.    In 2000, John Doe 8 was accused by AUC paramilitaries of stealing from a banana farm. John Doe 8 was taken by an AUC paramilitary commander and executed.

61.    When John Doe 7 approached the AUC about the killing, the commander said that they had killed John Doe 8 because the AUC were guarding the farm and responsible to prevent thefts, and suggested that they had eliminated a social undesirable.  The commander also threatened John Doe 7 about pursuing an investigation.

62.    On information and belief, Chiquita caused, intended, conspired in, and/or aided and abetted the death of John Doe 8 through its support of the AUC in Uraba.  On information and belief, Chiquita benefited from the death of John Doe 8 by sending a message that stealing from banana farms would result in being put to death without benefit of any judicial process.

**GENERAL ALLEGATIONS**

63.    At all times, Defendants knew or should have known that the AUC was a violent paramilitary organization continually engaging in vicious crimes and human rights violations against civilians in Colombia, including extrajudicial killing, torture, and forced disappearances.

64.    The acts described herein were inflicted under color of law and under color of official authority, and/or in conspiracy with, and/or in a joint criminal enterprise with, and/or in concert with, and/or on behalf of those acting under color of official authority.  The AUC has carried out its activities with both the tacit approval and active cooperation of official government security forces.  Moreover, high-ranking officials from across the Colombian government have been implicated in paramilitary collaboration, including fourteen current members of Congress, seven former lawmakers, the head of the secret police, mayors, and former governors. Furthermore, Chiquita's payments to the AUC were facilitated by CONVIVIRs, which are licensed by and operate with the express authority of the government.

65.    The acts described herein were conducted in the course of an internal armed conflict, in

CLASS ACTION COMPLAINT

which the AUC and other paramilitaries were engaged in combat with guerrilla armies, and committed the abuses against Plaintiffs and decedents as part of their prosecution of this conflict. The AUC and other paramilitaries were also engaged in this conflict in partnership with the Colombian military.

66.     The acts described herein were part of a widespread and systematic attack by the paramilitaries against the civilian population of the banana-growing region, as well as against several discrete sub-populations, including leftist politicians, labor organizers, community activists, persons considered socially undesirable, and perceived guerrilla sympathizers. This attack spanned a large swath of land in Colombia, resulted in the deaths of thousands of individuals, and was directed by a centrally commanded paramilitary organization. On information and belief, at all relevant times Chiquita had knowledge of this attack.

67.     The acts and injuries to Plaintiffs and decedents described herein were part of a pattern and practice of systematic human rights violations requested, paid for, ordered, confirmed, aided and abetted, and/or ratified by Chiquita and/or committed in conspiracy with the AUC.

68.     As a direct and proximate result of Chiquita's unlawful conduct, Plaintiffs have suffered and will continue to suffer harm including pain and suffering, personal injuries, property damages, harm to their livelihoods, and extreme and severe mental anguish and emotional distress. Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

69.     Plaintiffs' causes of action arise under and violate the following laws, agreements, conventions, resolutions and treaties:

(a) Alien Tort Claims Act, 28 U.S.C. § 1350;

(b) Torture Victims Protection Act, 28 U.S.C. § 1350, note;

(c) Customary international law;

(d) United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

(e) Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

(f) International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

(g) Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 1100, U.N. Doc. A/39/51

CLASS ACTION COMPLAINT

(1984);

(h) Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

(i) Common Article 3 of the 1949 Geneva Conventions; Articles 4 and 13 of the 1977 Geneva Protocol II;

(j) Common law of the United States of America;

(k) Statutes and common law of the State of New Jersey, including but not limited to wrongful death, assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, negligent hiring, civil conspiracy, and loss of consortium; and the

(l) Laws of Colombia.

70.     Legal action by Plaintiffs in Colombia would be futile. In June 2004, Chiquita sold its Colombian subsidiary Banadex. On information and belief, Chiquita no longer owns any production operations in Colombia and is not subject to service there. Furthermore, the political and legal system in Colombia is characterized by virtual impunity for the crimes of paramilitaries and those who assist them. The vast majority of arrest warrants for paramilitary leaders are never carried out, and when such figures are arrested they are frequently released or allowed to escape from security facilities. Military officers accused of collaboration with paramilitaries are routinely exonerated or given token sentences by military courts. Prosecutors, investigators, and judicial officials who pursue cases of human rights abuses implicating paramilitaries are subject to death threats and assassinations, and many have had to resign or flee the country as a result.

71.     Legal action by Plaintiffs in Colombia would also result in serious reprisals. Individuals who seek redress for paramilitary crimes committed against them or their family members are regularly targeted for further retributive violence.

72.     Plaintiffs were unable to bring suit in Colombia or the United States until the past year due to the poor security situation and the danger of reprisals, which Chiquita's support of the AUC contributed to.

## CLASS ACTION ALLEGATIONS

CLASS ACTION COMPLAINT

73.     Plaintiffs seek certification of this action as a class action under Rule 23 of the Federal Rules of Civil Procedure.  Plaintiffs allege that Chiquita supported a campaign of military and social control by the ACCU, and AUC, and/or other paramilitary groups from at least 1994 through 2004, whose goal, supported by Chiquita, was to exert total control over the land and inhabitants of the banana-growing region of Colombia.  Plaintiffs seek to represent a class consisting of all persons (including relatives and/or legal representatives of decedents) subjected to abuses by this campaign in the banana-growing region from 1994 through 2004.  Victims include, but are not limited to, individuals who were the objects of acts constituting extrajudicial killing; forced disappearance; torture; cruel, inhuman, or degrading treatment; kidnapping; rape; forced displacement; crimes against humanity; or crimes against civilians constituting war crimes.

74.     The members of the Class are so numerous that joinder of all members is impractical. The exact number and identities of all Class members is not currently known. According to reliable statistics, however, the AUC was responsible for many thousands of killings and many hundreds of massacres in Colombia between 1997 and 2004.  In 2001 alone, the AUC is believed to have committed at least 1,015 killings and over one hundred massacres; in 2003, the organization was allegedly responsible for the killing or disappearance of at least 1,300 people. In the banana-growing region of Uraba alone, human rights organizations have documented over 3,700 murders by the AUC during 1996–2004 and 60,000 forced displacements during the same period.  These figures suggest that the Class at minimum numbers in the thousands and may exceed ten thousand.

75.     There are questions of law and fact that are common to the Class, including but not limited to:

(a)     whether Defendants provided financial assistance to the AUC;

(b)     whether financial assistance provided to the AUC by Defendants substantially assisted it in perpetrating violations of Plaintiffs' fundamental human rights;

(c)     whether Defendants knew, or recklessly ignored, that the payments they made to the AUC were used to finance a campaign of terror directed at the civilian population in Colombia's banana-growing region;

(d)     whether Defendants provided support to the AUC for the purpose of suppressing labor

CLASS ACTION COMPLAINT

1   and community opposition;

2       (e)    whether Defendants knew, or recklessly ignored, that their business activities in

3   Colombia, which earned them millions of dollars, resulted in the extrajudicial killing, forced

4   disappearance, kidnapping, rape, forced displacement, property destruction, torture, or cruel, inhuman, or

5   degrading treatment of civilians who lived in Colombia;

6       (f)    whether the AUC acted as an agent of Defendants in carrying out a campaign of murder

7   and intimidation directed at union leaders, community activists, and political operatives in the areas of

8   Colombia where Defendants had their banana-producing operations, including whether Defendants

9   ratified such acts;

10       (g)    whether Defendants conspired with or aided and abetted the AUC in illegally importing

11   weapons and ammunition from Nicaragua into Colombia for use by the AUC in its paramilitary

12   campaigns;

13       (h)    whether the AUC, in committing the injuries inflicted on Plaintiffs, acted under the color

14   of state law and in a joint venture with official Colombian security forces;

15       (i)    whether the actions of the AUC constitute war crimes;

16       (j)    whether the actions of the AUC constitute crimes against humanity;

17       (k)    whether Defendants' actions as set forth herein constitute violations of international, New

18   Jersey, and/or Colombia law;

19       (l)    whether Defendants have been unjustly enriched by the violations set forth herein;

20       (m)    whether Defendants' behavior was negligent;

21       (n)    whether this Court has jurisdiction over the claims of the Class against Defendants;

22       (o)    whether this Court should order restitution or disgorgement of revenues and profits

23   relating to the violations described herein; and

24       (p)    whether Defendants should be subject to awards of compensatory and/or punitive

25   damages and the proper measure thereof.

26       76.    Plaintiffs' claims are typical of those of the Class in that Plaintiffs were civilians

27   inhabiting Colombia whose fundamental human rights were violated by the AUC during the time period

28   in which the AUC received financial and other assistance from Defendants.

CLASS ACTION COMPLAINT

77.    Plaintiffs will fairly represent the interests of the Class because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due to them for the conduct of which they complain. Plaintiffs have no interests that conflict with or are contrary to the interests of other Class members.

78.    Plaintiffs will adequately represent the class in that they are represented by counsel with extensive experience in international human rights and class action litigation.

79.    Pursuant to Fed. R. Civ. P. 23(b)(3), questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

80.    Pursuant to Fed. R. Civ. P. 23(b)(1)(B), adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications and/or would substantially impair or impede their ability to protect their interests.

81.    Statistics gathered on human rights abuses committed by the AUC during the years 1997 to 2004 indicate that the Class at minimum numbers in the thousands and may exceed ten thousand. In other cases involving claims for human rights abuses under the Alien Tort Statute and the Torture Victims Protection Act, individual plaintiffs have received multi-million-dollar damage awards. Successful actions against Defendants pursued independently by individual Class members could thus result in combined damages of hundreds of millions or billions of dollars.

82.    From January 1, 2007, through June 1, 2007, the average total market capitalization for CBI was approximately $645 million.  According to CBI's 2006 annual report, its total cash and cash equivalents amount to $65 million.

83.    Upon information and belief, the amount of damages which CBI can currently afford to pay is exceeded by the claims of the Class members.

84.    Although most Class members are located in Colombia, this will not hamper the ability to pursue this case as a class action since communication with Class members can be made with the assistance of various attorneys and non-governmental organizations operating in Colombia.

CLASS ACTION COMPLAINT

19

**FIRST CLAIM FOR RELIEF**

(Extrajudicial Killing)

85.     The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

86.     The deliberate killings, under color of law, of John Doe 2, Jane Doe 2, John Doe 4, John Doe 5, Jane Doe 4, and John Doe 8, were not authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

87.     The acts described herein constitute extrajudicial killing in violation of the Alien Tort Statute (28 U.S.C. § 1350), the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

88.     Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to bring about the extrajudicial killings committed against Plaintiffs.

**SECOND CLAIM FOR RELIEF**

(Crimes Against Humanity)

89.     The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

90.     The acts described herein against Plaintiffs constitute crimes against humanity, in violation of customary international law which prohibits inhumane acts of a very serious nature such as willful killing, torture, and arbitrary arrest and detention and other inhumane acts committed as part of a widespread or systematic attack against any civilian population or persecutions on political, racial, ethnic, cultural, or religious grounds.  Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

CLASS ACTION COMPLAINT

20

91.     Defendants participated in the widespread and systematic attack by persecution, by threats, murder, and other means, of persons perceived to be opponents of the AUC or of its allies, including Chiquita; of indigenous peoples; and of persons considered by Defendants and the AUC to be politically, culturally, socially, or ethnically undesirable.

92.     The acts described herein constitute crimes against humanity in violation of the Alien Tort Statute, customary international law, the common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

93.     Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the crimes against humanity committed against Plaintiffs.

### THIRD CLAIM FOR RELIEF

#### (Torture)

94.     The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

95.     Plaintiffs and their relatives were caused by the AUC to suffer severe mental or physical pain, inflicted deliberately and intentionally for purposes which included, among others, punishing the victim or intimidating the victim or third persons.

96.     The acts described herein against Plaintiffs and decedents constitute torture, in violation of the Alien Tort Statute (28 U.S.C. § 1350), the Torture Victim Protection Act (28 U.S.C. § 1350 note), customary international law, the common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

97.     Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to torture Plaintiffs.

CLASS ACTION COMPLAINT

21

1

**FOURTH CLAIM FOR RELIEF**

2

(War Crimes)

3

98.     The allegations set forth in the above paragraphs are realleged and incorporated by

4

reference as if fully set forth herein.

5

99.     Colombia has been engaged in an ongoing civil conflict with active hostilities, including

6

during the time of the events alleged in this Complaint. These ongoing hostilities constitute an armed

7

conflict not of an international character occurring in the territory of one of the High Contracting Parties,

8

as defined in Common Article 3 of the 1949 Geneva Conventions.  Defendants, through their actions

9

conspiring with the AUC, its actions in support of the AUC, and/or its actions carried out through the

10

AUC, are liable for war crimes perpetrated with their participation and/or ratification.

11

100.     Plaintiffs were civilians that took no part in the hostilities. Defendants made Plaintiffs the

12

object of attack and threats in violation of the laws of war. The acts described herein constitute violence

13

to life and person, including extrajudicial killing, torture, mutilation, the taking of hostages, the carrying

14

out of executions without previous judgment pronounced by a regularly constituted court, incidents of

15

outrages upon human dignity, forced movement, pillage, and denial of medical treatment.

16

101.     The crimes described herein are war crimes in violation of the Alien Tort Statute (28

17

U.S.C. § 1350), customary international law, the common law of the United States, the statutes and

18

common law of New Jersey, the laws of Colombia, and the international treaties, agreements,

19

conventions and resolutions described in the paragraphs above, including Common Article 3 of the

20

Geneva Conventions and Protocol II to those Conventions. Leaders, organizers, instigators, and

21

accomplices participating in the formulation of these acts are responsible for all acts performed by any

22

person in execution of such plan.

23

102.     Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered,

24

requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed,

25

ratified, and/or conspired with the AUC in bringing about the war crimes committed against Plaintiffs.

26

**FIFTH CLAIM FOR RELIEF**

27

28

CLASS ACTION COMPLAINT

22

(Terrorism)

103. The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

104. The abuses described above were premeditated, politically-motivated acts of violence committed against noncombatant civilians for the purpose of instilling fear, targeting political opponents, and generally terrorizing a civilian population.

105. The abuses described herein constitute terrorism in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the statutes and common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above. Leaders, organizers, instigators, and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

106. Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the acts of terrorism against Plaintiffs.

### SIXTH CLAIM FOR RELIEF

(Material Support to Terrorist Organizations)

107. The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

108. At all times relevant to this Complaint, the AUC has been an organization engaged in acts of premeditated, politically-motivated violence against noncombatant targets. The AUC's terrorist activities have been well-known at all relevant times, and, on information and belief, Defendants were aware of such activities. From September 10, 2001, until the present, the AUC has been designated by the United States government as a Foreign Terrorist Organization.

109. As detailed above, Defendants provided a variety of forms of material support to the AUC, including cash and assistance in trafficking weapons.

110. Defendants knew, or should have known, that providing such support would cause Plaintiffs' injuries, and this support did in fact proximately cause Plaintiffs' injuries by giving the AUC

CLASS ACTION COMPLAINT

23

1  the means to carry out acts of terrorism and violence.

2    111.    The acts of providing assistance to the AUC described herein constitute material support

3  to a terrorist organization in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary

4  international law, the statutes and common law of the United States, the statutes and common law of

5  New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and

6  resolutions described in the paragraphs above.  Leaders, organizers, instigators, and accomplices

7  participating in the formulation of these acts are responsible for all acts performed by any person in

8  execution of such plan

9    112.    Defendants are liable to Plaintiffs for said conduct in that Defendants directed, ordered,

10  confirmed, ratified, aided and abetted, recklessly allowed, and/or conspired to accomplish the provision

11  of material support to the AUC, whose terrorist actions caused Plaintiffs' injuries.

12                            **SEVENTH CLAIM FOR RELIEF**

13                        (Cruel, Inhuman, or Degrading Treatment)

14    113.    The allegations set forth in the above paragraphs are realleged and incorporated by

15  reference as if fully set forth herein.

16    114.    The acts described herein had the intent and the effect of grossly humiliating and

17  debasing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish,

18  and/or breaking their physical or moral resistance.

19    115.    The acts described herein against Plaintiffs and decedents constitute cruel, inhuman, and

20  degrading treatment or punishment, in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary

21  international law, the common law of the United States, the statutes and common law of New Jersey, the

22  laws of Colombia, and the international treaties, agreements, conventions and resolutions described in

23  the paragraphs above.

24    116.    Defendants' acts alleged herein caused Plaintiffs to be placed in great fear for their lives

25  and forced them to suffer severe physical and psychological abuse and agony.

26    117.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered,

27  requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed,

28  ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the

CLASS ACTION COMPLAINT

1  Colombian military, to bring about the cruel, inhuman, and degrading treatment committed against

2  Plaintiffs.

3  ### EIGHTH CLAIM FOR RELIEF

4  (Violation of the Rights to Life, Liberty and Security of Person

5  and Peaceful Assembly and Association)

6  118.   The allegations set forth in the above paragraphs are realleged and incorporated by

7  reference as if fully set forth herein.

8  119.   The execution of the decedents as a result of their or others' opposing the activities of the

9  AUC, Chiquita, or other interests allied with the AUC violated and deprived them of their rights to life,

10  liberty and security of person, and their rights to peaceful assembly and association for which each

11  defendant may be held liable.

12  120.   The wrongful acts described herein violated and deprived Plaintiffs of their rights to life,

13  liberty and security of person, and to peaceful assembly and association, in violation of the Alien Tort

14  Statute (28 U.S.C. § 1350), customary international law, the common law of the United States, the

15  statutes and common law of New Jersey, the laws of Colombia, and the international treaties,

16  agreements, conventions and resolutions described in the paragraphs above.

17  121.   Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered,

18  requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed,

19  ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the

20  Colombian military, to bring about the violations and deprivations of the rights to life, liberty and

21  security of person and peaceful assembly and association.

22  ### NINTH CLAIM FOR RELIEF

23  (Consistent Pattern Of Gross Violations Of Internationally Recognized Human Rights)

24  122.   The allegations set forth in the above paragraphs are realleged and incorporated by

25  reference as if fully set forth herein.

26  123.   The above-described abuses against Plaintiffs and decedent occurred within the context of

27  numerous similar abuses and killings, comprising a consistent pattern of gross violations of human

28  rights.

CLASS ACTION COMPLAINT

124.    The wrongful acts described herein violated and deprived Plaintiffs of their rights to life, liberty and security of person, to peaceful assembly and association, and to be free from torture, extrajudicial killing, and cruel, inhuman and degrading treatment, in violation of the Alien Tort Statute (28 U.S.C. § 1350), customary international law, the common law of the United States, the statutes and common law of New Jersey, the laws of Colombia, and the international treaties, agreements, conventions and resolutions described in the paragraphs above.

125.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC, which was acting under color of law by collaboration with the Colombian military, to bring about the violations and deprivations of these rights.

## TENTH CLAIM FOR RELIEF

### (Wrongful Death)

126.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

127.    As a direct result of Defendants' acts and omissions and as a result of the deaths described above, Plaintiffs have sustained pecuniary loss resulting from the loss of society, comfort, attention, services, and support of the decedents.

128.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in bringing about the wrongful deaths of the decedents..

129.    The acts described herein constitute wrongful death, actionable under the laws of New Jersey, the United States, and Colombia.

## ELEVENTH CLAIM FOR RELIEF

### (Assault and Battery)

130.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

131.    Defendants' actions constituted offensive and harmful touching of Plaintiffs' persons without the consent of Plaintiffs, and/or the creation of a reasonable apprehension that such touching

CLASS ACTION COMPLAINT

1  would result.

2      132.    As a result of these acts, Plaintiffs were placed in great fear for their lives and suffered

3  severe physical and psychological abuse and agony.

4      133.    Defendants' acts were willful, intentional, wanton, malicious, and oppressive.

5      134.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered,

6  requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed,

7  ratified, and/or conspired with the AUC in bringing about the assault and battery of Plaintiffs and

8  decedents.

9      135.    The acts described herein constitute assault and battery, actionable under the laws of New

10  Jersey, the United States, and Colombia.

11                          **TWELFTH CLAIM FOR RELIEF**

12                          (Intentional Infliction of Emotional Distress)

13      136.    The allegations set forth in the above paragraphs are realleged and incorporated by

14  reference as if fully set forth herein.

15      137.    The acts described herein constitute extreme and outrageous conduct in violation of all

16  normal standards of decency and were without privilege or justification.

17      138.    These outrageous acts were intentional and malicious and done for the purposes of

18  causing Plaintiffs to suffer humiliation, mental anguish, and extreme emotional and physical distress.

19      139.    As a direct and proximate result of Defendants' acts, Plaintiffs were placed in great fear

20  for their lives and were forced to suffer severe physical and psychological abuse and agony. The distress

21  suffered by Plaintiffs is severe enough that no reasonable person could be expected to endure it.

22      140.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered,

23  requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed,

24  ratified, and/or conspired with the AUC in bringing about the intentional infliction of emotional distress

25  of Plaintiffs and decedents.

26      141.    Defendants' outrageous conduct constitutes the intentional infliction of emotional distress

27  and is actionable under the laws of New Jersey, the United States, and Colombia.

28                          **THIRTEENTH CLAIM FOR RELIEF**

CLASS ACTION COMPLAINT

1      (Negligent Infliction of Emotional Distress)

2      142.    The allegations set forth in the above paragraphs are realleged and incorporated by

3   reference as if fully set forth herein.

4      143.    At all relevant times, Defendants owed Plaintiffs a duty to act with reasonable care,

5   and/or injury to Plaintiffs was reasonably foreseeable.

6      144.    At all relevant times, Defendants had the power, ability, authority, and duty to stop

7   engaging in the wrongful conduct herein and to intervene to prevent or prohibit such conduct.

8      145.    At all relevant times, Defendants knew, or should have known, that the conduct described

9   herein would and did proximately result in physical and emotional distress to Plaintiffs.  Despite said

10  power, knowledge, and duty, Defendants breached its duty to Plaintiffs and negligently failed to act so as

11  to stop engaging in the conduct described herein and to prevent or prohibit such conduct or otherwise to

12  protect Plaintiffs.

13     146.    As a direct and legal result of Defendants' wrongful acts, Plaintiffs have suffered and will

14  continue to suffer significant physical injury, pain and suffering, and extreme and severe mental anguish

15  and emotional distress. The distress suffered by Plaintiffs is severe enough that no reasonable person

16  could be expected to endure it.

17     147.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered,

18  requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed,

19  ratified, and/or conspired with the AUC in bringing about the negligent infliction of emotional distress

20  of Plaintiffs and decedents.

21     148.    Defendants' conduct constitutes the negligent infliction of emotional distress and is

22  actionable under the laws of New Jersey, the United States, and Colombia.

23                       **FOURTEENTH CLAIM FOR RELIEF**

24                   (Negligence/Negligent Hiring/Negligence Per Se)

25     149.    The allegations set forth in the above paragraphs are realleged and incorporated by

26  reference as if fully set forth herein.

27     150.    Despite having the duty to do so, Defendants failed to use ordinary or reasonable care in

28  order to avoid injury to Plaintiffs, including but not limited to through their negligent financial support

CLASS ACTION COMPLAINT

of the AUC and their participation in the transfer of arms and ammunition to the AUC. Defendants' conduct failed to protect Plaintiffs from an unreasonably great risk of harm. Defendants' negligence was a cause of injury, damage, loss, or harm to Plaintiffs and their next of kin.

151.    Defendants' negligent actions include, but are not limited to, unreasonably disregarding the risk that persons in their employ would commit torts against Plaintiffs and decedents, and violating statutes and other laws designed to protect Plaintiffs and decedents.

152.    As a result of these acts, Plaintiffs suffered harm including, but not limited to, severe emotional distress. Defendants' conduct constitutes negligence and is actionable under the laws of New Jersey, the United States, and Colombia.

## FIFTEENTH CLAIM FOR RELIEF

### (Loss of Consortium)

153.    The allegations set forth in the above paragraphs are realleged and incorporated by reference as if fully set forth herein.

154.    At all times prior to their deaths, the decedents noted above were faithful, loving, and dutiful spouses and parents to the Plaintiffs who are their spouses and children.

155.    As a result of the acts of Defendants, those Plaintiffs who are the spouses and children of the decedents have been deprived of the decedents' society, comfort, attention, services, and support, all to their damage, in an amount to be proved at trial. In addition, those Plaintiffs have suffered and incurred the expenses of funeral and burial for the decedents, in an amount to be proved at trial.

156.    Defendants are liable to Plaintiffs in that they aided and abetted, directed, ordered, requested, paid, were reckless in dealing with, participated in a joint criminal enterprise with, confirmed, ratified, and/or conspired with the AUC in causing Plaintiffs to suffer loss of consortium.

157.    Defendants' conduct constitutes loss of consortium and is actionable under the laws of New Jersey, the United States, and Colombia.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

CLASS ACTION COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, each and every Plaintiff prays for judgment against each defendant in excess of $75,000, as follows:

    (a)    for compensatory damages, including general and special damages;

    (b)    for punitive damages;

    (c)    for injunctive and declaratory relief as this Court deems appropriate;

    (d)    for disgorgement of profits;

    (e)    for treble damages;

    (f)    for costs of suit, attorneys fees and such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable.

DATED:   July 18, 2007

Respectfully submitted,

Judith Brown Chomsky
Attorneys for Plaintiffs

CLASS ACTION COMPLAINT

# INITIAL CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Pursuant to L. Civ. R. 11.2, plaintiffs certify that the matter in controversy in this case is the subject of the following pending actions:

*Doe v. Chiquita Brands Int'l, Inc.*, No. 1:07-cv-01048 (D.D.C. June 7, 2007)

Plaintiffs: Jane/John Does 1–144

Defendants: Chiquita Brands International, Inc.; David Does 1–10

*Gonzalez Carrizosa v. Chiquita Brands Int'l, Inc.*, No. 07-60821 (S.D. Fla. June 13, 2007)

Plaintiffs: Antonio Gonzalez Carrizosa, Julia Ester Durango Higita, Liliana Maria Cardona, Maria Patricia Rodriguez, Ana Francisca Palacios Moreno, Luz Marleni Durango David, Rosa Zuniga Ibargen, Luis Amparo Cogollo Osorio, Celia Modesta Narvaez de Madrid, Edith Montiel Ballesteros, Maria de la Cruz Varelas Lopez, Ana Dolis Alcaraz, Silvia Luz Acevedo de Builes, Juan Pablo Orozco Builes, Maria Camila Orozco Builes, Isabel Cristina Orozco Builes Catalina del Carmen Altamiranda de Meza, Eipolita Cardales Moreno, Nancy del Carmen Mayo, Luz Nidia Berrio Rodriguez, Luz Mery Perez Serna

Defendants: Chiquita Brands International, Inc., and Chiquita Fresh North America LLC

DATED:   July 18, 2007

Respectfully submitted,

Judith Brown Chomsky
Attorneys for Plaintiffs

INITIAL CERTIFICATION PURSUANT TO L. CIV. R. 11.2

1